ENTRY OF FINDINGS AND CONCLUSIONS FOLLOWING TRIAL
 

 TINDER, District Judge.
 

 Plaintiff, Derek Lamont Brookins, claims that Defendant, Indianapolis Power
 
 &
 
 Light Company (“IPL”), failed to provide a reasonable accommodation of his disability of depression and/or anxiety, in violation of the Americans with Disabilities Act (“ADA”), 42 U.S.C. §§ 12101,
 
 el seq.
 

 [1]
 

 Trial was held and the court received testimony in person as well as documentary exhibits. These findings are based on the preponderance of the evidence.
 
 [2]
 

 
 *996
 
 I. Facts Established at Trial
 

 From 1989 through March 26, 1997, Mr. Brookins was employed by IPL, most recently in the position of Control Person. During 1996, Mr. Brookins experienced a variety of problems including several difficult domestic situations, financial difficulties in connection with an effort to purchase an apartment building, withdrawal from involvement with others, difficulty sleeping and substantial daily alcohol consumption. His work attendance, which had been a problem for him on several occasions in the past, was again deteriorating. He claimed to have had difficulty concentrating on his work. Around October of 1996, Mr. Brookins voluntarily became involved in IPL’s Employee Assistance Program (“EAP”), which was operated by IPL to assist employees experiencing various personal problems including drug or alcohol use, domestic difficulties and emotional problems.
 

 Linda Hardwick, as director of Employee and Retiree Assistance at IPL, was the contact person for those participating or interested in the EAP. Mr. Brookins contacted IPL’s occupational health nurse in September 1996, requesting a referral to a stress center or stress program. On that request, Ms. Hardwick referred Mr. Broo-kins to the Merit Behavior Corporation (“Merit”), which evaluated him, first through interviews and then by having him participate in a detoxification program. He entered a two-day inpatient “detox” program at Winona Hospital related to his alcohol and marijuana consumption and continued to attend group therapy sessions for about a month. Mr. Brookins was being treated through what was described as an intensive outpatient program of counseling and therapy. As a part of that program, Mr. Brookins consulted with a psychiatrist, Dr. James Nicholas, who diagnosed Mr. Brookins as suffering from alcoholism and “anxiety/depression.” Dr. Nicholas issued him prescriptions for medication as treatment for depression. At the time he saw Mr. Brookins, Dr. Nicholas was .in the process of leaving Merit, so he advised Mr. Brookins that he would need to see a different psychiatrist for any further treatment, although, he did offer to see Mr. Brookins at his new location, if necessary. The prescriptions issued near the end of October, 1996, were sufficient to allow Mr. Brookins to obtain thirty days worth of medication. The main benefit that Mr. Brookins gained from the medication was assistance in sleeping.
 

 Ms. Hardwick’s role with respect to the EAP was to assist the employee in scheduling an initial evaluation and to serve as a liaison among the employee, the treatment program and the employee’s supervisors, as needed. She also monitored such things as the employee’s attendance or participation in assistance programs when information would come to her about such things. In essence, she would get the ball rolling to make assistance available to the employee, but the determination of the course of treatment would be made by the health care or other service provider and the employee. Her function could be described as connecting the employee up with the appropriate provider, who would then be responsible for the treatment of the employee. The range of personal problems subject to the EAP is a broad spectrum of difficulties, from drug and/or alcohol addiction to a need for marital counseling. At all times, the employee ultimately controlled whether he or she would continue in the assistance program because it was completely voluntary. Ms. Hardwick also stood ready to help employees schedule appointments with health care or other service providers, if requested; however, her permission or approval was not necessary for an employee to utilize the services of any health care provider.
 

 Mr. Brookins was covered by an Anthem health insurance plan provided by IPL which covered the cost of health care services, including such costs as might result from participation in the EAP or related
 
 *997
 
 treatments. The Anthem plan used a network of approved health care providers. Ms. Hardwick would also provide names of participating health care providers to employees or others, if requested, but she did not control who was on the list or what provider any employee would be permitted to visit. That information was also available through other sources, such as an insurance plan handbook and the insurer. In short, Ms. Hardwick provided coordinating services but she did not control the type, timing or method of treatment of employees in the EAP.
 

 In approximately December of 1996, Ms. Hardwick learned that Mr. Brookins had dropped out of the group therapy sessions that had been recommended for him through Merit. She learned this initially through a conversation with the person at Merit in charge of the intensive out-patient therapy program who reported that Mr. Brookins had stopped attending sessions in early November. Mr. Brookins had made it clear to those in charge of the intensive out-patient therapy that he wanted medication, not counseling sessions. Ms. Hard-wick was subsequently contacted by Mr. Brookins and was told that he did not think group therapy was helpful at all and that what he really wanted was to find another psychiatrist so that he could get his medications refilled. Ms. Hardwick told Mr. Brookins that it is very difficult to get a referral to a psychiatrist unless you attend therapy or counseling sessions. Mr. Brookins was aware of that, having been through the process before.
 

 Mr. Brookins testified that he called Ms. Hardwick shortly after Dr. Nicholas told him that he would no longer be available through Merit, seeking referral to another psychiatrist. He contended that Ms. Hardwick told him to wait until he was down to about two weeks worth of medication and then she would refer him to another psychiatrist. He then testified that he made numerous unsuccessful efforts to contact her to get that referral, and that his supervisor did the same thing on Ms behalf. He said that he then ran out of medication, and his condition began to worsen. Only after several months, in March of 1997, did he reach Ms. Hardwick and was then told by her to go to his personal physician for medication.
 

 Ms. Hardwick disputed that account. Her more credible version of these events is discussed below. She contends that she returned all messages and denies that she either committed to refer him to another psychiatrist or ignored Ms requests for her to do so.
 

 On approximately March 18, 1997, Ms. Hardwick had a telephone discussion with Mr. Brookins in which he expressed Ms concern about not being able to get refills on some prescriptions that the Merit psychiatrist had given Mm. She suggested that he contact Ms PGP (which the court understands stands for Ms Personal Care Physician, a doctor who is on the Anthem list of approved providers) to get some medication until he could get a proper psychiatric referral. Mr. Brookins reported that he had been trying to get in to see Ms PGP, Dr. Earnest Berry, Jr., but was not getting responses from his efforts to do so.
 
 [3]
 
 Dr. Berry, a family practice doctor, had been Mr. Brookins’ personal physician since about 1994. Ms. Hardwick then called Dr. Berry’s office to intercede and learned from the staff there that they had no record of contacts by Mr. Broo-kins.
 
 [4]
 
 On Ms. Hardwick’s request, Mr.
 
 *998
 
 Brookins was given an appointment with Dr. Berry that very day. Dr. Berry had been notified of Mr. Brookins’ detoxification hospitalization in October of 1996 and had a note in his file that Mr. Brookins was being evaluated and treated for alcoholism and anxiety/depression in connection with that. Dr. Berry merely noted those things for his file but was not consulted regarding the treatment at. that time.
 

 Subsequently, Ms. Hardwick spoke directly with Dr. Berry on March 21, 1997. Mr. Brookins had gone back to Dr. Berry on that day for a follow up exam. During that conversation, Dr. Berry indicated that Mr. Brookins had been unable to work because of medical reasons since March 10th but that he was being released to return to work without restriction on the following Monday, March 24, 1997.
 
 [5]
 
 He also transmitted a copy of that release to IPL. Dr. Berry did indicate in the conversation that he felt that Mr. Brookins should be. seen by a psychologist, which he noted in his file on Mr. Brookins, but he did not condition his release of Mr. Broo-kins to return to work on a restriction or condition that such a consultation was required.
 
 [6]
 
 There was no reference to that recommendation in the document he submitted to IPL to justify Mr. Brookins’ absence. According to Dr. Berry, Ms. Hardwick told him that she was surprised by that because she was under the impression that Mr. Brookins had refused counseling. He also noted that Ms. Hardwick said that she would arrange an appointment and communicate the name and time to Dr. Berry the following week. Dr. Berry made a preliminary diagnosis of Mr. Brookins conditions as alcoholism, anxiety and depression (without characterizing the extent or degree of depression). Despite those things, Dr. Berry was confident that Mr. Brookins could function in the workplace so that his release form for Mr. Brookins was unconditional.
 

 Dr. Berry had the authority to refer Mr. Brookins directly to a psychiatrist, both from a medical perspective and as a provider under the Anthem network. Dr. Berry could have reviewed the provider directory to find a psychiatrist in the network or could have contacted Merit to follow up with this. His understanding that the referral had to go through Ms. Hardwick at IPL came only from conversations he had with Mr. Brookins, not the insurance policy or prior experiences.
 

 Ms. Hardwick never promised Mr. Broo-kins or Dr. Berry that she would arrange a
 
 psychiatric
 
 (as opposed to psychological) visit or referral for Mr. Brookins, nor did she refuse to do so. And what she did promise, she either accomplished, or did not have a full opportunity to accomplish. She told Mr. Brookins that she would refer him to a stress program, and she arranged for him to go to Merit. (As per the design of IPL’s EAP, it was Merit, rather than
 
 *999
 
 Ms. Hardwick, who had previously evaluated Mr. Brookins and determined that he should participate in therapy and see a psychiatrist.) Later, on March 18, 1997, Mr. Brookins told Ms. Hardwick that he was having difficulty scheduling an appointment with Dr. Berry, so she offered to intercede on his behalf. Ms. Hardwick called Dr. Berry’s office, and that same day, Mr. Brookins was given an appointment to see Dr. Berry, The only promise that she did not fulfill was her promise to Dr. Berry to arrange an appointment with a psychologist for Mr. Brookins. She committed to make this appointment during the week of March 24, 1997. However, Mr. Brookins continued to fail to report to work during that week (despite Dr. Berry’s clearance), and he was fired on Wednesday, March 26, 1997. Therefore, Ms. Hardwick was not given a full opportunity to fulfill this promise.
 

 Mr. Brookins failed to return to work on the 24th. He also failed to call in to report his non-attendance. On March 25th, a couple of hours after his shift was to have started, Mr. Brookins did call IPL and spoke to the Director of Human Resources, Lowell McGauhey. Mr. Brookins complained to Mr. McGauhey about a number of things in a rambling, confused conversation. He was not pleased with the fact that he had been required to go through the detoxification process, he was disappointed in the type of medication he had been given, he did not like how he was treated in the EAP process, among other things. He also mentioned that he had difficulties communicating with Ms. Hard-wick relative to getting an appointment with a new psychiatrist. Mr. McGauhey reminded Mr. Brookins of his obligation to come to work. Because of concerns arising out of that conversation about drug and/or alcohol abuse, Mr. McGauhey told Mr. Brookins that he would have to report for a “fitness for duty” exam at the Methodist Health Clinic, which would include a drug and alcohol screening. Arrangements were made for Mr. Brookins to have that exam later that day. Mr. Brookins sounded reluctant about reporting for the exam but he did not verbally refuse to do so. Nor did he ask for a leave of absence or any deferral of his reporting date. He did ask Mr. McGauhey several times, though, whether he should just terminate his employment.
 

 Had Mr. Brookins failed the drug and/or alcohol test, he would not have been fired for that reason because IPL had a “three strikes” policy regarding substance abuse and Mr. Brookins did not have strikes against him. Mr. Brookins failed to appear for the exam and was absent from work again on the 26th without excuse or notice.
 

 Mr. Brookins’ employment was terminated the next day for the stated reason of absenteeism. Prior to this series of events, Mr. Brookins had been disciplined or counseled on several occasions about deficient attendance.
 

 II. Conclusions of Law
 

 A. Introduction
 

 The ADA defines “discrimination” in part as “not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual.” 42 U.S.C. § 12112(b)(5)(A);
 
 see also Sieberns v. Wal-Mart, Stores, Inc.,
 
 125 F.Bd 1019, 1022 (7th Cir.1997) (citing
 
 Bombard v. Fort, Wayne Newspapers, Inc.,
 
 92 F.3d 560, 563 (7th Cir.1996) (“Unlawful discrimination under the ADA includes ... the failure to provide reasonable accommodation.”)). Mr. Brookins’ sole claim at trial is that IPL discriminated against him in violation of the ADA by failing to provide a reasonable accommodation.
 

 B. Qualified Individual with a Disability
 

 In order to succeed in making an ADA reasonable accommodation claim, a plaintiff must establish first that he was “a qualified individual with a disability.”
 
 Id.
 
 (citing
 
 Bombard,
 
 92 F.Bd at 563 (“The ADA proscribes discrimination against
 
 *1000
 
 only ‘qualified individuals] with a disability.’”) (quoting 42 U.S.C. § 12112(a));
 
 Weiler v. Household Fin. Corp.,
 
 101 F.3d 519, 525 (7th Cir.1996) (“Recovery under the ADA also requires a plaintiff to establish she is a qualified individual with a disability.”)). “A ‘qualified individual with a disability is defined, in relevant part, as: ‘an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.’ ”
 
 Id.
 
 (quoting
 
 Bombard,
 
 92 F.3d at 563; 42 U.S.C. § 12111(9)). The determination as to whether an individual is a “qualified individual with a disability” must be made as of the time of the employment decision.
 
 See id.
 
 (citation omitted). “The plaintiff bears the burden of proof on this issue; he must be able to show that he is a ‘qualified individual with a disability’ in order to successfully prosecute an ADA claim.”
 
 Id.
 
 (citation omitted).
 

 1. Qualified According to the Seventh Circuit, “it [is] fair to conclude that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs.”
 
 Waggoner v. Olin Corp.,
 
 169 F.3d 481, 484-85 (7th Cir. 1999) (citing
 
 Nowak v. St. Rita High Sch,
 
 142 F.3d 999, 1003 (7th Cir.1998) (“[A]n employee who does not come to work cannot perform the essential functions of his job.”);
 
 Tyndall v. National Educ. Ctrs.,
 
 31 F.3d 209, 213 (4th Cir.1994) (“Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise.”);
 
 Jackson v. Veterans Admin.,
 
 22 F.3d 277 (11th Cir.1994) (an employee with a history of sporadic unpredictable absences is not otherwise qualified under the ADA)). However, the
 
 Waggoner
 
 court noted that it was
 

 not establishing a hard-and-fast rule that no absences from work need be tolerated. We have indicated our willingness to look to the reasonableness of an accommodation of a requested medical leave.... However, in evaluating any requested accommodation, the issue will be whether the hardship imposed on the employer by it is ‘undue.’ ... [A] business ‘was not obligated to tolerate erratic, unreliable attendance or to provide an accommodation which would impose an undue hardship on the business.’
 

 Id.
 
 at 485 (quoting
 
 Haschmann v. Time Warner Entertainment Co.,
 
 151 F.3d 591, 601 (7th Cir.1998); 42 U.S.C. § 12111(10)).
 

 Mr. Brookins failed to report to work from March 10, 1997 until his termination on March 26, 1997. There was no evidence presented at trial that he even reported to IPL that he would be absent.
 
 [7]
 
 Mr. Brookins did testify that by that time, he had already used up all of his vacation and sick days. When Dr. Berry spoke with Ms. Hardwick on March 21, 1997, he indicated that Mr. Brookins would be able to return to work on March 24. (Def.’s Ex. A.) However, Mr. Brookins continued to fail to report to work, even after being medically cleared to work by his own physician.
 

 IPL has shown that regular attendance is an essential requirement of Mr. Broo-kins’ position. The IPL employee handbook states, unambiguously and emphatically, “REGULAR ATTENDANCE IS A CONDITION OF YOUR EMPLOYMENT!” (Def.’s Ex. E (Employee manual) at 12.) When Mr. Brookins began his employment at IPL, an IPL employment-
 
 *1001
 
 personnel representative specifically discussed the company’s policy on absenteeism. (Def.’s Ex. D.) And finally, on March 25, 1997, both Mr. Brookins’ immediate supervisor (David Hope) and Mr. McGau-hey told Mr. Brookins that his attendance that day was mandatory and that failure to appear for work on March 26, 1997 would constitute insubordination, which could result in his discharge.
 

 Mr. Brookins argues that his poor attendance was caused by IPL’s failure to accommodate his depression by scheduling an appointment for him to see a psychiatrist. As discussed below, this is not the type of “accommodation” that the ADA requires of employers. Therefore, although the definition of a “qualified individual” under the ADA is “an individual with a disability who,
 
 with or without reasonable accommodation,
 
 can perform the essential functions of the employment position that such individual holds
 
 or
 
 desires,” 42 U.S.C. § 12111(9) (emphasis added), Mr. Brookins has failed to identify any “reasonable accommodation” that is cognizable under the ADA that would have changed his attendance.
 
 [8]
 

 Cf
 
 U.S. Equal Opportunity Employment Commission,
 
 Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act
 
 at 24, question number 37 (“[I]f an employee with a disability, with or without reasonable accommodation, cannot perform the essential functions of the position ... in the absence of medication, [or medical] treatment, ... then s/he is unqualified.”).
 

 Therefore, the court finds that Mr. Brookins is not entitled to the protections of the ADA because he has not shown that he is a “qualified individual.”
 
 See, e.g., Waggoner v. Olin Corp.,
 
 169 F.3d 481, 484-85 (7th Cir.1999) (“[I]t [is] fair to conclude that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability.”) (citations omitted). For this reason alone, IPL is entitled to judgment in its favor.
 

 2. Disability
 

 Under the ADA, an individual is “disabled” if he (1) has “a physical or mental impairment that substantially limits one or more ... major life activities”; (2) has “a record of such an impairment”; or (3) is “regarded as having such an impairment.”
 
 Schneiker v. Fortis Ins. Co.,
 
 200 F.3d 1055, 1059-60 (7th Cir.2000) (quoting 42 U.S.C. § 12102(2)). Mr. Brookins has the burden of proving that he was disabled within the meaning of the statute.
 
 See id.
 
 at 1059 (citation omitted). As noted above, the determination as to whether an individual is a “qualified individual with a disability” must be made as of the time of the employment decision.
 
 See Nowak v. St. Rita High Sch,
 
 142 F.3d 999, 1003 (7th Cir.1998).
 

 “To be ‘substantially limited’ means that the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population.”
 
 Krocka v. City of Chicago,
 
 203 F.3d 507, 513 (7th Cir. 2000) (citations omitted).
 

 
 *1002
 
 Mr. Brookins does not specify which major life activity (or activities) that he claims was significantly restricted by his depression/anxiety.
 
 [9]
 
 On the stand, he seemed to claim to have been unable to work, to sleep, to pay bills, or to otherwise care for himself. However, the more credible evidence was presented by Dr. Berry, who testified that on March 21, 1997, he felt that Mr. Brookins suffered from depression, but did not diagnose any particular category of depression (such as major depression). He testified specifically that Mr. Brookins’ “depression was not such that it was limiting his major life activities, at least in terms of getting back to work on [March] 24th.” On March 18, 1997, when Dr. Berry examined Mr. Brookins, Dr. Berry reported generally normal clinical findings with the exception of the diagnosis of “anxiety/depression” and “insomnia.” (Def.’s Ex. B.) He prescribed sleeping medication, and by March 21, Dr. Berry reported that the medication was “helpful.”
 
 [10]
 

 (Id.)
 
 And as discussed above, while Dr. Berry felt that Mr. Brookins should be examined by a psychologist, he also felt that Mr. Brookins was capable of returning to work in the meantime.
 
 (Id.;
 
 Defi’s Ex. A.)
 

 Given Dr. Berry’s credible testimony, the court has no basis to find that
 
 at the time he was fired from IPL,
 
 Mr. Brookins suffered from an impairment that substam tially limited one or more major life activities. Mr. Brookins has clearly failed to show that he was substantially limited in the life activity of working given Dr. Berry’s medical clearance for' him to go to work. Mr. Brookins failed to argue that he was substantially limited in any particular major life activity (the court simply assumes that he contends that he was substantially limited in his ability to work), and the court has not been’provided with sufficient credible evidence to evaluate Mr. Brookins’ limitations on any major life activities other than work. Mr. Brookins had the burden of proof on this issue, so this failure to produce evidence dooms his claim that he was actually disabled within the meaning of the ADA.
 

 There is some evidence to show that IPL regarded Mr. Brookins as disabled and had a record of him as having a disability. Ms. Hardwick knew that Mr. Brookins had been enrolled in Merit and learned from Dr. Berry that Dr. Berry recommended that Mr. Brookins be evaluated by a psychologist. In Mr. Brookins testimony and in Ms. Hardwick’s testimony there were a couple of vague allusions to Mr. Brookins’ supervisor at IPL knowing that Mr. Brookins had problems with anxiety/depression. And Mr. McGauhey knew that Mr. Brookins had been enrolled in the EAP and had problems with alcohol. However, none of this evidence is sufficient to show that IPL either regarded Mr. Brookins .as disabled or had a record of his disability.
 

 Again, the only major life activity that seems to be at issue here is the major life activity of working. ' “In order to show a substantial limitation on his ability to work, an individual must demonstrate that his impairment significantly restricts ‘the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.’ ”
 
 Krocka,
 
 203 F.3d at 513 (quoting 29 C.F.R. § 1630.2(j)(3)(i); citation omitted). “For purposes of [the ‘regarded as’ prong], the employer’s perception of the plaintiffs inability to work must have a comparable breadth [as the “substantial” requirement for the actual disability prong].”
 
 Skorup v. Modern Door Corp.,
 
 153 F.3d 512, 515 (7th Cir.1998) (citation omitted).
 

 
 *1003
 
 Mr. Brookins has shown that a few IPL employees knew he had been diagnosed with depression (Ms. Hardwick and Mr. Brookins’ supervisor), or had general concerns about alcoholism (Mr. McGauhey). But the record before Ms. Hardwick (in the form of the note from Dr. Berry) was that Mr. Brookins was well enough to be at work on March 21, 1997 and thereafter. There is no evidence that Mr. Brookins’ supervisor knew that Mr. Brookins was afflicted with anxiety/depression of such a magnitude as to prevent him from working a class or broad range of jobs. And Mr. McGauhey only had generalized concerns that Mr. Brookins may have an alcohol or drug problem.
 

 None of this evidence is sufficiently definite to show that IPL regarded Mr. Broo-kins as having a substantial limitation on his ability to work or had a record of him having such a limitation.,
 
 Cf. Skorup,
 
 153 F.3d at 515 (“To establish that the ADA applies to her condition, [plaintiffl needed to identify what requirements posed by the class ... jobs (or ... by a broad range of ... jobs) were problematic in light of the limitations her [impairment] imposed upon her. This is not an onerous requirement, but it does require at least some evidence from which one might infer that [Skorup] faced significant restrictions in her ability to meet the requirements of other jobs.”) (citation omitted).
 

 Up until this point, the court has assumed that the relevant time for determining whether Mr. Brookins was disabled within the meaning of the ADA was some time between March 24, 1997 and his discharge on March 26, 1997. However, to the extent Mr. Brookins’ claim is that the failure to provide a reasonable accommodation occurred prior to March 24, then Mr. Brookins has shown that IPL regarded him as unable to work in any capacity, given Dr. Berry’s statement to that effect to Ms. Hardwick, and had a record of such a disability, given Dr. Berry’s note that was transmitted to IPL.
 

 C. Reasonable Accommodation
 

 The ADA requires an employer to make “reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.” 42 U.S.C. § 12112(b)(5)(A);
 
 see also Pond v. Michelin N. Am., Inc.,
 
 183 F.3d 592, 595 (7th Cir.1999). The ADA defines “reasonable accommodation” as follows:
 

 (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
 

 (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
 

 42 U.S.C. § 12111(9). As is implicit from this definition, an employer’s obligation to make “reasonable accommodations” only extends to job-related adjustments or modifications. The implementation guidelines of the Equal Employment Opportunity Commission (“EEOC”) (the agency charged with implementing the ADA) provides, in relevant part:
 

 The obligation to make reasonable accommodation is a form of non-discrimination. It applies to all employment decisions and to the job application process. This obligation does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability. Thus, if an adjustment or modification is job-related, e.g., specifically assists the individual in performing the duties of a particular job, it will be considered a type of reasonable accommodation. On the other hand, if an
 
 *1004
 
 adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not required to provide. Accordingly, an employer would generally not be required to provide an employee with a disability with a prosthetic limb, wheelchair, or eyeglasses. Nor would an employer have to provide as an accommodation any amenity or convenience that is not job-related, such as a private hot plate, hot pot or refrigerator that is not provided to employees without disabilities.
 

 It should be noted, however, that the provision of such items may be required as a reasonable accommodation where . such items are specifically designed or required to meet job-related rather than personal needs. An employer, for example, may have to provide an individual with a disabling visual impairment with eyeglasses specifically designed to enable the individual to use the office computer monitors, but that are not otherwise needed by the individual outside of the office.
 

 29 C.F.R. Pt. 1630, App. § 1630.9 (citations omitted);
 
 see also Burnett v. Western Resources, Inc.,
 
 929 F.Supp. 1349, 1358 (D.Kan.1996) (“Only job-related adjustments or modifications, which enable an individual to perform the duties of a particular job, are required as reasonable accommodations. An employer is not required to provide modifications which assist an individual throughout his or her daily activities, on and off the job.”);
 
 Schmidt v. Safeway Inc.,
 
 864 F.Supp. 991, 996 (D.Or.1994) (“The employer is not required to pay for the [medical] treatment ..., since the medical treatment benefits the employee both on and off the job, not just in his capacity as an employee.”); U.S. Equal Opportunity Employment Commission,
 
 Enforcement Guidance: Reasonable. Accommodation and Undue Hardship Under the Americans With Disabilities Act
 
 at 24, question number 36 (“[A]n employer has no responsibility to monitor an employee’s medical treatment or ensure that s/he is receiving appropriate treatment because such treatment does not involve modifying workplace barriers.”); U.S. Equal Opportunity Employment Commission,
 
 Enforcement Guidance: The Americans With Disabilities Act and Psychiatric Disabilities
 
 at 22-23, question number 28 (“Medication monitoring is not a reasonable accommodation. Employers have no obligation to monitor medication because doing so does not remove a barrier that is unique to the workplace. When people do not take medication as prescribed, it affects them on and off the job.”);
 
 cf. Robertson v. Neuromedical Ctr.,
 
 161 F.3d 292, 296 (5th Cir.1998) (“[Plaintiff] mischaracterizes the decision to take or not to take medication for his condition as an accommodation option available to [employer]. Because this personal decision rests solely with [plaintiff], [employer] was not in a position to ‘accommodate’ him in this way. Thus, we find this argument wholly without merit.”).
 

 Mr. Brookins argues that IPL had an obligation to schedule an appointment for him to see a psychiatrist who would prescribe medication for his depression and/or general anxiety disorder. This is the only “reasonable accommodation” he requested, and it is the only one he claims was necessary for him to return to work.
 
 [11]
 
 However, as indicated by the previous paragraph, this is not the type of “accommodation” that an employer is required to provide under the ADA. Mr. Brookins made it clear in his testimony that at the time in question, the effects of his depression/anxiety not only prevented him from going to work, but also prevented him from being a functional person. He claims
 
 *1005
 
 he was unable to pay his bills, read, sign his name, concentrate, sleep, or otherwise take care of his day-to-day living needs.
 
 [12]
 
 The “accommodation” Mr. Brookins sought from IPL was primarily for his personal benefit, and is not the type of “accommodation” IPL was required to provide.
 
 See, e.g.,
 
 29 C.F.R. Pt. 1630, App. § 1630.9 (“[I]f an adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not required to provide.”).
 

 D. Interactive Process
 

 The ADA contemplates that employers and disabled employees will engage in an interactive process to determine an appropriate reasonable accommodation.
 
 See Sieberns v. Wal-Mart Stores, Inc.,
 
 125 F.3d 1019, 1023 (7th Cir.1997). Although Mr. Brookins has not raised an argument that IPL failed to engage in such an interactive process, the court notes that the argument would be unsuccessful.
 

 To be certain, during Mr. Brookins’ string of absences during March of 1997, there was very little interaction between IPL and Mr. Brookins. However, Mr. Brookins clearly did not make himself available to interact with IPL during those absences. When he did leave messages with Ms. Hardwick, she returned them. And when he requested assistance in making an appointment with Dr. Berry in order to get the medication he needed, she made the appointment that very day. Therefore, it appears that to the extent that Mr. Brookins allowed an interactive process to proceed, Ms. Hardwick (on behalf of IPL) accommodated his requests.
 

 Moreover, even if IPL failed to adequately engage in the interactive process, the Seventh Circuit has stated: “The interactive process the ADA foresees is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought.”
 
 Sieberns,
 
 125 F.3d at 1023. The court continued, “Wal-Mart knew of no accommodation for the clerk/sales position in the Electronics Department that could help Sieberns, nor did Sieberns present any proposed accommodation for that job. Without such a proposal, the interactive process would not even begin.”
 
 Id.
 

 In this case, Mr. Brookins did not indicated to IPL (until March 18, when he spoke with Ms. Hardwick) why he was repeatedly absent. Other than the request that Ms. Hardwick make an appointment for him with Dr. Berry (a request which she immediately fulfilled), he never proposed any “accommodation” (either as the term is used in the ADA, or otherwise) that would allow him to show up. Therefore, there is no claim against IPL for failing to engage in the interactive process. Indeed, as discussed in
 
 Cannice v. Nor-west Bank Iowa N.A.,
 
 189 F.3d 723 (8th Cir.1999), there is no such thing as an ADA “claim” for failing to engage in the interactive process:
 

 Mr. Cannice concludes that Norwest’s failure to take ... active steps [in the interactive process] itself constitutes disability discrimination under 42 U.S.C. § 12112(b)(5)(A). We have recently held, however, that there is no per se liability under the ADA if an employer
 
 *1006
 
 fails to engage in an interactive process, so this claim fails.
 

 Mr. Canniee, moreover, did not make out any other kind of submissible case under the ADA, because he lacked proof that an accommodation of his disability would have allowed him to keep his job. That was an element of his case.... “[T]he employee still carries the burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the essential functions of the job.”
 

 Id.
 
 at 727-28 (quotations and citations omitted).
 

 E.
 
 Siefken
 
 Rule
 

 “A plaintiff cannot recover under the ADA if through his own fault he fails to control an otherwise controllable illness.”
 
 Van Stan v. Fancy Colours & Co.,
 
 125 F.3d 563, 570 (7th Cir.1997) (citing
 
 Siefken v. Village of Arlington Heights,
 
 65 F. 3d 664, 666 (7th Cir.1995) (plaintiffs failure to monitor and control his controllable diabetes barred recovery under the ADA)). In
 
 Siefken,
 
 the court stated:
 

 We ... hold that when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet the employer’s legitimate job expectations, due to his failure to control a controllable disability, he cannot state a cause of action under the ADA.
 

 65 F.3d at 667 (quotation omitted).
 

 Mr. Brookins knew he was afflicted with the disability (to the extent it can be considered as such in this case) of depression/anxiety. It is clear that Mr. Brookins needed or requested no “accommodation” from IPL as that term is used in the ADA.
 
 [13]
 
 It is further clear that by repeatedly failing to report for work, or even calling to say that he would not be at work, Mr. Brookins failed to meet IPL’s legitimate job expectations. (Def.’s Ex. E (Employee manual) at 12 (“REGULAR ATTENDANCE IS A CONDITION OF YOUR EMPLOYMENT!”).)
 
 See, e.g., Waggoner v. Olin Corp.,
 
 169 F.3d 481, 484-85 (7th Cir.1999) (“[Attendance at the job site is a basic requirement of most jobs.”) (citing,
 
 inter alia, Nowak v. St. Rita High Sch.,
 
 142 F.3d 999, 1003 (7th Cir.1998) (“[A]n employee who does not come to work cannot perform the essential functions of his job.”)). Finally, it is also clear that, by Mr. Brookins’ own admission, his depression/anxiety was controllable, and he failed to control it.
 
 [14]
 
 Therefore, Mr. Brookins “cannot state a cause of action under the ADA.”
 
 Siefken,
 
 65 F.3d at 667.
 

 In addition, implicit in
 
 Siefken’s
 
 holding is that a “reasonable accommodation” is not simply excusing past misconduct. The court stated:
 

 Under the ADA, an employer must make reasonable accommodations to enable a disabled employee to perform his job duties. When asked what accommodation Siefken would request, his counsel replied, ‘A second chance.’ But this is not an accommodation, as envisioned in the ADA.... It is plain enough what ‘accommodation’ means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work. Siefken is not asking for an accommodation; he is not asking the Village to change anything. He is asking for an
 
 *1007
 
 other chance to allow him to change his monitoring technique. But the ADA does not require this.
 

 Siefken,
 
 65 F.3d at 666-67 (quotation omitted). The EEOC’s Enforcement Guidance elaborates: “Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual’s disability.” U.S. Equal Opportunity Employment Commission,
 
 Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act
 
 at 24, question number 35.
 

 To the extent Mr. Brookins argues that IPL should have overlooked his long string of absences, this is not an “accommodation” that is required by the ADA. Moreover, Dr. Berry’s retroactive “excusing” of the prior weeks of absences is not something that the ADA required IPL to accept. Further, IPL did not give Mr. Brookins the impression that his attendance violations would be excused simply because he had been involved in the EAP — the IPL employee handbook says that “[i]nvolvement in the [EAP] will not lessen disciplinary action for unimproved performance, attendance problems, or a deteriorating safety record.” (Def.’s Ex. G at 13-14.)
 

 F. Reliance
 

 Mr. Brookins’ primary argument is that once IPL scheduled an appointment for Mm (which ultimately led to his one visit with a psychiatrist), IPL was then obligated to continue to do so. In other words, the argument seems to be that even if IPL was not initially obligated to arrange Mr. Brookins’ medical treatments (because, as discussed above, it is not the type of “accommodation” required by the ADA), once IPL undertook to do so, the ADA required IPL to continue.
 

 The problem with this argument is that it finds no support in the text of the statute, the regulations, or the relevant case law. For instance, there is no indication that the ADA’s definition of a “reasonable accommodation” shifts (more specifically, expands) based upon what the employer has done in the past.
 
 Cf. Corder v. Lucent Technologies, Inc.,
 
 162 F.3d 924, 928 (7th Cir.1998) (despite the fact that “Lucent went the extra mile and then some for Corder”, the usual definitions and standards under the ADA applied). Clearly, it would be a bad policy to adopt the rule advocated by Mr. Brookins. If every employer who went above and beyond the minimum requirements of the ADA were then obligated to continue providing such services indefinitely, then very few employers would ever go above the minimum requirements of the ADA. It hardly seems consistent with the purposes of the ADA that employers be effectively punished for going above and beyond the statute’s “reasonable accommodation” requirements. As the Seventh Circuit has stated, “if the employer ... bends over backwards to accommodate a disabled worker — goes further than the law requires — ... it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.”
 
 Vande Zande v. State of Wis. Dep’t of Admin.,
 
 44 F.3d 538, 545 (7th Cir.1995).
 

 Moreover, there are problems with Mr. Brookins’ argument on a factual level. Mr. Brookins’ argument depends upon the court making the following findings: Mr. Brookins asked Ms. Hardwick to arrange for him an appointment with a psychiatrist; Ms. Hardwick agreed that she would; and then Ms. Hardwick did not do so and did not return Mr. Brookins’ phone calls for many months. As indicated above, the court did not find this account to be credible. But even accepting this version of the events, Mr. Brookins’ argument is problematic. As discussed above, the EAP is not designed to make diagnoses and prescribe treatments for the employee — it only directs employees to those who can. The EAP, through Ms. Hardwick, directed Mr. Brookins to Merit, who then diagnosed him and placed him
 
 *1008
 
 into a program. When Mr. Brookins quit attending the program’s therapy sessions and quit communicating with Merit, Merit and Ms. Hardwick reasonably concluded that Mr. Brookins had dropped out of the program. Ms. Hardwick did not arrange Mr. Brookins’ one meeting with a psychiatrist — Merit did. So Mr. Brookins’ expectation that Ms. Hardwick would immediately send him to another psychiatrist was unreasonable. And even under Mr. Broo-kins’ story, Ms. Hardwick told him that it was very difficult to get a referral to psychiatrist unless he was attending therapy sessions. (Dr. Berry confirmed this concept in his testimony.) Finally, upon Mr. Brookins’ request, Ms. Hardwick
 
 did
 
 schedule an appointment for Mr. Brookins with Dr. Berry, who had the authority to prescribe the medication that Mr. Broo-kins felt he needed. At this point, Mr. Brookins had violated the IPL attendance policy, but he was not yet under the threat of being terminated. Ms. Hardwick could not force Dr. Berry, or any other doctor, to prescribe certain medication for Mr. Brookins — all she could do was put him in touch with a doctor. The fact that Dr. Berry declined to prescribe Mr. Brookins’ desired medication and determined that he was fit to return to work was not under the control of either Ms. Hardwick or IPL. Similarly, the fact that Mr. Brookins choose not to participate in the Merit program was not under the control of either Ms. Hardwick or IPL. And the fact that Mr. Brookins choose not to schedule another appointment with Dr. Nicholas, or with any other psychiatrist, also was not under the control of either Ms. Hardwick or IPL.
 

 III. Conclusion
 

 The court finds that Mr. Brookins is not entitled to the protections of the ADA because he has not shown that he is a “qualified individual with a disability.” The court further finds that the sole “accommodation” requested by Mr. Brookins is not the type of “accommodation” that the ADA requires employers to provide. Therefore, IPL will be GRANTED judgment in its favor on Mr. Brookins’ “reasonable accommodation” claim.
 

 A final judgment will be entered in accordance with this entry and with the Entry Discussing Pending Motions (issued April 23, 1999), pursuant to Rule 58 of the
 
 Federal Rules of Civil Procedure.
 

 [1]
 

 . In the court’s Entry Discussing Pending Motions, issued April 23, 1999, the court found that summary judgment should be granted as to Mr. Brookins' two other claims (which allege discriminatory discharge in violation of the ADA and Title VII of the Civil Rights Act of 1964).
 

 [2]
 

 . The distinction between factual findings and legal conclusions is often a blurry one and some matter's are mixed questions of law and fact. The court has attempted to provide a gross separation of the facts being found from the legal conclusions being applied simply for ease of readership. To any extent this memorandum may lack precision in separating the facts from the law or if it improperly labels a finding of fact, conclusion of law or mixed question of fact and law, no confusion is intended and all findings, conclusions and mixed questions should be considered to be what they are and not limited by their labeling.
 

 [3]
 

 . This statement by Mr. Brookins does not ring true. In fact, Mr. Brookins had seen Dr. Berry regarding a cold in January or February of 1997. He said nothing during that visit regarding depression or prescription needs that he had at that time.
 

 [4]
 

 . As noted above, Mr. Brookins testified that he had left messages for Ms. Hardwick on numerous occasions between his notification by the psychiatrist that he was leaving Merit in March and that the messages went unre-turned. The more credible evidence was that Ms. Hardwick returned any messages she received from Mr. Brookins, either directly or by leaving a message with his foreman. She was diligent about returning messages. As
 
 *998
 
 with Mr. Brookins’ statements about the difficulty of getting in to see Dr. Berry, the more credible evidence is that both Ms. Hardwick and Dr. Berry were much more accessible than Mr. Brookins suggests.
 

 [5]
 

 . Interestingly, Dr. Berry relied on Mr. Broo-kins subjective descriptions about the length of time that he had been able to work. Dr. Berry’s observation of Mr. Brookins near the end of that period indicated that Mr. Broo-kins’ fatigue had diminished an that there was no objective reason why he could not return to work on the 24th.
 

 [6]
 

 . Dr. Berry was explicit in his testimony that his recommendation was for "psychological” intervention in contrast to a referral for psychiatric treatment. He indicated that it was his experience: that an appropriate referral was to a psychologist for evaluation. In turn, if the psychologist determined that psychiatric consultation was necessary, then he or she would make that referral. This is significant because if Dr. Berry had been of the opinion that medication for Mr. Brookins' condition was indicated immediately, he could have prescribed it or he could' have recommended that the intervention be done by a psychiatrist, who would have had authority to prescribe medication. He also could have conditioned Mr. Brookins’ release to work on psychiatric treatment or appropriate anti-depression medication, but he did not.
 

 [7]
 

 . In the evidentiary submissions at the summary judgment stage, IPL submitted an affidavit from David Hope, Mr. Brookins’ immediate supervisor, who indicated that on the working days between and including March 11, 1997 and March 18, 1997, Mr. Brookins did call in absent to Mr. Hope's voice mail. (Hope Aff. 115.) However, Mr. Hope was not called to testify at trial, and this evidence was not presented in any other fashion.
 

 [8]
 

 . And even if IPL’s referral of Mr. Brookins to Merit (which led to his visit with the psychiatrist) could be considered a "reasonable accommodation” under the ADA, Mr. Brookins rejected IPL’s accommodation by refusing to attend the therapy sessions which were part of the Merit program. It appears that Mr. Brookins’ refusal to attend the therapy sessions at Merit caused him to not have access to Merit's psychiatric referrals. "[I]f [an] individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessaiy to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.” 29 C.F.R. § 1630.9(d);
 
 see also Schmidt v. Methodist Hosp. of Ind., Inc.,
 
 89 F.3d 342, 344-45 (7th Cir. 1996).
 

 [9]
 

 . Depression has been recognized by the Seventh Circuit as a "disability” within the meaning of the ADA, provided that the ADA’s "disability” definition is met.
 
 See Krocka,
 
 203 F.3d at 512.
 

 [10]
 

 . It is worth noting that the main benefit that Mr. Brookins reportedly gained from the medication prescribed by Dr. Nicholas, the psychiatrist, was assistance in sleeping.
 

 [11]
 

 . Mr. Brookins does not contend that he requested a leave of absence from IPL to control his depression/anxiety. He also does not now contend that a leave of absence alone would have been helpful. He only contends that he needed medications to control his impairment.
 

 [12]
 

 . The court accepts these assertions from Mr. Brookins about the severity of his impairments for the purposes of argument. However, the court notes that it does not find them to be completely credible. Dr. Berry examined Mr. Brookins on Friday, March 21, 1997 (a time in which Mr. Brookins was missing work and was supposedly in the midst of a major depressive episode) and determined that Mr. Brookins should be medically cleared to return to work on the following Monday. He put no restrictions on this return to work, and chose not to prescribe medication for Mr. Brookins’ depression/anxiety, despite having the authority to do so. There is no evidence that Mr. Brookins voiced any disagreement to Dr. Berry’s assessments and actions.
 

 [13]
 

 . As discussed above, an "accommodation” under the ADA is a job-related adjustment or modification, which enables an individual to perform the duties of a particular job, as opposed to a modification which assists an individual throughout his or her daily activities.
 
 See, e.g., 29
 
 C.F.R. Pt. 1630, App. § 1630.9.
 

 [14]
 

 . For instance, Mr. Brookins could have obtained the medication he felt he needed from Dr. Berry and IPL would have reimbursed him if he had. He also could have accepted Dr. Nicholas' invitation to continue being Dr. Nicholas’ patient.